OPINION
This appeal is taken by Plaintiff-Appellant Scott McKay from the judgment entered by the Court of Common Pleas of Hardin County upon a jury verdict in favor of the Defendants, Hardin Memorial Hospital, et al.
The following facts are a summary of the evidence and testimony presented at trial. Many relevant facts are not disputed:
 As a young child Scott McKay (hereinafter "Scott"), Appellant, lived in California. Scott enjoyed good health and an active youth despite his episodes of irritable bowel syndrome and depression. As a result of his irritable bowel problems, Scott had already had been tested twice by sigmoidoscopy and several barium enemas before the age of thirty. After college Scott moved to Ohio to attend the Medical College of Ohio (hereinafter "MCO"). After two years at MCO Scott received his Masters degree in Occupational Health.
While attending MCO, Scott met and began dating Dr. Sandy Vonderembse, a psychiatrist. The two later became engaged and Scott moved into Dr. Vonderembse' home in Oak Harbor in spring 1995. The couple enjoyed a very active lifestyle including riding bicycles and swimming.
In 1995 Scott was employed by Whitaker Technical Services (hereinafter "WTS") as a contractor. In September of that year WTS assigned Scott to work as a safety engineer at Durez Occidental Chemical (hereinafter "Durez") in Kenton Ohio, approximately one and a half hours travel from Scott's residence in Oak Harbor.
On the morning of Friday September 29, 1995, Scott awoke "got up, had the usual pain, cramping, went to the bathroom, got [his] shower, ate breakfast, packed a lunch and went to work." On his way to work the cramping and the pain increased. Only thirty minutes after he arrived at work Scott was forced to use the restroom. He was in the restroom for nearly thirty minutes with chronic diarrhea. He returned to the restroom at approximately 10:30 with increased diarrhea, remaining for nearly forty-five minutes. Fearing a sudden necessity to return a third time Scott did not return to his work-site, but instead paced the lobby sweating profusely.
One of Scott's co-workers, Sandy Shaner (hereinafter "Shaner"), had an office adjacent to the lobby and noticed that Scott was sweating profusely, his eyes were red and his skin was pale. Shaner asked Scott if he wanted her to phone an ambulance and Scott replied, "yes." Shaner phoned the ambulance. While waiting for the ambulance Scott fainted.
The ambulance arrived. Upon arrival the EMT's (Emergency Medical Technician) found Scott "lying on [a] first aid bed complaining of pain to the upper right quadrant and tenderness to the upper left quadrant" of his abdomen. Scott was put on oxygen for comfort and transported by ambulance to Hardin Memorial Hospital (hereinafter "HMH") (an Appellee in the instant case) for treatment. HMH was the closest hospital to Durez and it is the practice of the EMT's to take the patient to the nearest hospital.
Upon arrival at HMH, Scott's vital signs and patient information were taken immediately by Nurse Jolene Hamm. When asked if there was anyone the hospital could contact Scott told the nurse to contact his fiancée, Dr. Vonderembse. The Nurse successfully phoned Dr. Vonderembse and informed her that Scott was in the emergency room but that he was in stable condition and would probably be released shortly. Nearly 15 minutes later, Dr. Victor Angel (hereinafter "Dr. Angel"), the physician on duty in the emergency room that Friday (Appellee in the instant case) took Scott's medical history and examined Scott.
Dr. Angel was employed by M.E.F. Inc, a corporation owned and operated by Dr. Michael E. Failor.[1] M.E.F. furnishes emergency room doctors to at least twelve hospitals in Ohio on a temporary basis. Dr. Angel, a surgeon, was not certified in emergency room practice.
When examining Scott, Dr. Angel noticed that Scott had a diffused abdomen, tenderness, guarding, rigidity and rebound. Dr. Angel felt Scott may have had a "borderline surgical abdomen". To investigate further, Dr. Angel ordered blood tests and x-rays of the abdominal region. The blood tests revealed a stable white blood cell count.
Dr. Cherukuri, the radiologist on duty that Friday at HMH, reviewed and interpreted Scott's x-rays. Dr. Cherukuri found some retained feces in the right portion of the colon, not a large amount, no significant amount of retained feces in the left portion of the colon, no air in the abdomen outside of the intestines and no evidence of blockage. His impressions were that there were "no significant abnormalities in the abdomen except for some retained feces in the right quadrant."
After a review of the x-rays and the blood tests Dr. Angel informed Scott that "[he] was full of it. He smirked and said you're just full of it." Scott said, "what do you mean?" Dr. Angel replied, "[You are] constipated. Scott replied, "I've been constipated before but this is different." Dr. Angel reassured Scott not to worry and that he'd push it (the feces) out of Scott in about twenty three minutes by administering an enema and if "that didn't work we'd go the other way".
About fifteen minutes later a nurse on duty that Friday moved Scott to the rear of the emergency room and placed him on the toilet located there. Several minutes later a nurse administered Scott an IV and an enema. Scott asked the nurse to help him insert the enema, as he was unable to bend over due to pain. The nurse refused to help and he was forced to administer the enema himself. Almost immediately Scott's pain increased. Scott reportedly told the nurse almost instantaneously, "I [am] in pain, * * * it [is] just unbearable, * * * please go get the doctor." The nurse told him she'd try. Scott testified that she never returned and neither did Dr. Angel. In addition Scott testified that he was never removed from his sitting position on the toilet and the next individual he saw was his fiancée, Dr. Vonderembse at 5:30, nearly three hours later.
However, Dr. Angel and several nurses testified that Scott's vitals signs were continuously monitored and Dr. Angel himself periodically looked in on him. However, it is undisputed that Dr. Angel did not physically examine Scott again after the initial intake and no further recording of Scott's vitals occurred between the time the enema was administered and the time Dr. Vonderembse arrived.
When Dr. Vonderembse walked into the emergency room she was directed to Scott's area in the rear of emergency. As she entered she noticed Scott hunched over on the toilet. His abdomen was so bloated it appeared as if he had a beer belly. Scott was in excruciating pain and unable to talk loudly. Dr. Vonderembse was forced to kneel to listen to Scott. Almost immediately Dr. Vonderembse went to seek out Dr. Angel.
Dr. Vonderembse found Dr. Angel eating his dinner. Dr. Vonderembse and Dr. Angel discussed Scott's condition and Dr. Angel testified that he told Dr. Vonderembse that he wanted to admit Scott but Scott refused. Dr. Vonderembse, however, testified that Dr. Angel told her that Scott should be admitted and that he phoned a surgeon to look at Scott but he wouldn't be available until the next morning.
Dr. Vonderembse returned to Scott's area in the back of emergency and told him that he would not be seen by a surgeon until the morning and asked him if he wished to remain or go to Fremont Memorial Hospital (hereinafter "FMH"), the hospital where Dr. Vonderembse works and where Scott had previously been a patient. Scott replied affirmatively. Dr. Vonderembse drove Scott to FMH. Upon arrival at FMH Scott was diagnosed with severe appendicitis and scheduled for surgery.
During surgery Dr. Kanakaraj, discovered that Scott's condition wasn't the result of appendicitis but rather a "sigmoid volvulus", a complete twisting of the sigmoid colon. In Scott's case, the sigmoid colon had twisted completely and the blood supply to the colon was completely cut off. This portion of the colon had become gangrenous. As a result, the sigmoid tissue lost its integrity and the colon had perforated releasing fecal matter into the abdominal cavity and upper respiratory cavity (a condition known as sepsis).
Scott was in the hospital for several days and then was released in the care of his fiancée, Dr. Vonderembse. However, shortly after his release Scott developed an upper respiratory infection brought on by the sepsis, a condition commonly known as ARDS. Scott was immediately placed in the intensive care unit and his condition worsened. He was transferred to MCO where he slipped into a coma. Scott eventually recovered but not before undergoing at least three more surgeries and extensive physical and mental therapy. He lost two years of wages and had extensive medical bills totaling over three hundred fifty thousand dollars. Sometime after his recovery Scott and Dr. Vonderembse broke off their engagement due in large part to Scott's illness.
On September 3, 1996, Scott filed a complaint in the Common Pleas Court of Hardin County against HMH, Dr. Angel, and M.E.F. Inc. alleging negligence and praying for relief in the amount of two million dollars. After several years of discovery, miscellaneous motions, and dismissal of several defendants the trial finally commenced on June 5, 2000 against M.E.F, HMH and Dr. Angel. Each party presented the testimony of several witnesses, including expert testimony by doctors and nurses. Each witness was thoroughly questioned and cross-examined.
After eight full days of testimony and arguments, the jury returned a verdict for the defendants. Three quarters of the jury found that HMH was not negligent, that Dr. Angel was not negligent and further that Scott McKay was not negligent. On July 17, 2000, the trial court entered judgment upon the verdict. The entry is in part:
 The Court upon review of the verdict and interrogatories in open court and in the presence of counsel finds the verdict and the interrogatories to be in order, in compliance with the law and consistent. The court therefore finds that judgment should be rendered upon the verdict.
On July 10, 2000, Scott filed a motion for a new trial. In support of his motion Scott argued that 1) the judgment was not sustained by the weight of the evidence; 2) misconduct of the prevailing party; 3) newly discovered evidence and 4) other good cause shown, specifically "the jurors were unable to understand the law of the case". All parties filed responses. In its judgment entry dated August 8, 2000, the trial court overruled Scott's motion for a new trial. The entry is in part:
 The manifest weight of the evidence does not require that the verdict be overturned. There was competent credible evidence from which a jury could conclude as it did. On the state of the evidence, the Court is unwilling to substitute its judgment for that of the jury and overturn the verdict.
On appeal from those judgment entries McKay presents a single assignment of error asserting that the trial court erred by failing to grant a new trial.
Regarding the standard of review for an appellate court on matters such as this, a trial court is said to be vested with broad discretion in determining whether to order a new trial. Osler v. Lorain (1986),28 Ohio St.3d 345. Thus, the granting or denial of a motion for a new trial will not be disturbed absent an abuse of judicial discretion.Yungwirth v. McAvoy (1972), 32 Ohio St.2d 285.
Scott makes presents two arguments in support of his assertion that the trial court erred by failing to grant a new trial. First Scott claims that the verdict was against the manifest weight of the evidence. Second, Scott argues that the trial court should have allowed him to clarify the issue of the burden of proof in his closing arguments to the jury. Each argument will be addressed separately.
Manifest Weight of the Evidence
It is well settled that judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279. Furthermore, it must be remembered that on the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. (1972), 32 Ohio St.2d 285.
Scott's principal argument in support of his assertion that the verdict was against the manifest weight of the evidence was that the Defendants were "clearly negligent". However, as long as "competent, credible evidence" is in the record to support a Defendant's verdict, regardless of the existence of contradictory evidence, the verdict must be sustained.
A thorough review of the record reveals that competent, credible evidence was presented by the Defendants to rebut every allegation set forth by Scott at trial. Specifically, there was testimony by Dr. Norman Schneiderman that Dr. Angel met the applicable standard in providing care for Scott, that surgical intervention as early as 3:00 p.m. would not have prevented contamination of the peritoneal cavity, and nearly every expert testified that the diagnosis made by Dr. Angel at Scott's initial arrival in the emergency room was accurate. In addition, on cross-examination, Scott's own testimony concerning the events that occurred on Friday September 29, 1995 while at HMH was called into question due to the memory problems that Scott suffered after his coma.
Having found competent credible evidence to support the jury's verdict in favor of the Defendant-Appellants Scott's first argument is without merit.
Closing Arguments
Prejudice arising from abuse by counsel during closing arguments may be proper grounds for a new trial. Maggio v. Cleveland (1949), 151 Ohio St. 136
paragraph two of the syllabus; Dillon v. Bundy (1991), 72 Ohio App.3d 767,773, jurisdictional motion overruled, 61 Ohio St.3d 1422. Counsel are given wide latitude in making oral arguments to the jury. Pang v. Minch
(1990), 53 Ohio St.3d 186, paragraph two of the syllabus; Sheets v.Norfolk Southern Corp. (1996), 109 Ohio App.3d 278, 291. "The determination of whether the bounds of permissible argument have been exceeded is, in the first instance a discretionary function to be performed by the trial court." Clark et al., v. Doe (1997),119 Ohio App.3d 296, 305; citing Pang v. Minch (1990), 53 Ohio St.3d 186,194. The trial court's determination will not be reversed absent an abuse of discretion. Id. at 305.
In the instant case, during closing argument Scott's counsel made the following statements:
Mr. Murray:
 * * * One of the basic parts of civil law is what's called the burden of proof.
 A party which claims something is true has the burden of proving that. That applies to Scott McKay. Scott McKay must prove to you his case. His case is very simple. His claim is that he suffered severe injury because of medical negligence. The failure of Dr. Angel and Harding hospital to provide adequate care. It's that simple.
 The Defense has the burden of proving that they have something to be true. That would apply to Dr. Victor Angel. He must prove to the extent that he claims that after he saw those x-rays **
 Ms. Sieler: Judge, Objection. May counsel approach
A colloquy concerning the burden of proof ensued at the bench. The trial judge warned the Plaintiff to refrain from making misleading statements regarding the Defendant's burden of proof but allowed Scott's counsel to address his own burden of proof. The conversation is in pertinent part:
 The Court: Let's stay away from Dr. Angel. You can talk about your own burden of proof and I'll instruct the jury on the proper burden of proof as to Dr. Angel and what Dr. Angel must prove and what the Plaintiff must prove. I'll deal with the law and I have an instruction on who is to prove what and what Dr. Angel does, in fact, have.
 Mr. Murray: I can state, though, that the extent that party that claims something is true must prove it, can't I?
 The Court: You can state the Plaintiff has the burden of proof on the issues in the Plaintiff's case. The Defendant has the burden of proving the truth of any affirmative defenses that they have. * * * I don't want to mislead the jury, but saying the Defendant has the burden of proof, that's not fair to the Defendant to say that. He has to disprove the he has to disprove his own negligence. * * * [I]t is misleading to require the Defendant to prove anything other than the affirmative claims or affirmative defenses which he or they make.
On appeal Scott argues that the trial court's interruption and later admonition during his closing arguments prejudiced his case because the jury was misinformed on the burden of proof. However, as previously stated it is within the discretion of the trial court to determine the appropriate bounds of closing arguments. Furthermore, the trial court properly recognized that it is the "inherent power and statutory duty of the trial court" not counsel "to instruct the jury fully and correctly on all the applicable law" including the burden of proof. State v. Rollins
(1976), 49 Ohio App.2d 330, 331.
It should be noted however, that after closing arguments the trial court proceeded to instruct the jury correctly on the burden of proof in a civil suit. Scott's counsel did not object to those instructions.
No abuse of discretion having been shown Scott's second argument is also without merit and his sole assignment of error is overruled and the judgment of the Court of Common Pleas of Hardin County is affirmed.
WALTERS, P.J., and SHAW, J., concur.
[1] An issue at trial was whether Dr. Angel was employed directly by M.E.F. or whether Dr. Angel was an independent contractor. This court does not decide that issue today and uses the term "employed" in its general sense.